Matjbice Wahl, J.
In these multiple, nonpayment proceedings, consolidated for the purpose of a joint trial, there is no dispute regarding the nonpayment of the rent due by each tenant as claimed by the landlord.
The issue presented is by these 14 tenants of the Lillian Wald Houses project of the landlord Authority, united in interest, in urging a rent abatement, by way of counterclaim, amounting to one half of the rent due from each of tenants for the months of March, April and May, 1968, except for two tenants who are in arrears for April and May, 1968. These counterclaims are founded on a claim of inadequate police protection afforded them in this very large public housing development where 1,861 tenants reside in 16 buildings.
The landlord, a public housing authority existing pursuant to the Public Housing Law, is exempt from the provisions of the New York City Bent and Behabilitation Law (Local Laws, 1962, No. 20 of City of New York, as amd.; Administrative Code of City of New York, § Y51-3.0, subd. e, par. 2, subpar. [f]; § 51-6.0, subd. e). All tenants in the Authority’s projects have a written lease for one month, which is automatically renewed for successive one-month terms, unless terminated as therein provided. There is no covenant in the lease dealing with police protection.
To implement the housing article of the New York State Constitution (art. XVIII), the Legislature enacted the Public Housing Law (ch. 44-A of Cons. Laws; L. 1939, ch. 808, as amd.). Section 402 of the Public Housing Law makes special provisions with respect to New York City. Subdivision 5 thereof authorizes the creation and maintenance of a police force. It vests the Authority with ‘ ‘ discretion to provide and maintain a housing police department and a uniformed housing police force.” It *147 further vests such police force with certain powers, authority and jurisdiction.
Although the Authority maintains a police force of approximately 1,100 men, including the assignment of 10 police and 2 security guards at Lillian Wald Houses, the tenants claim that this assigned number is inadequate in light of the alleged high crime rate in and about the project. They claim that the Authority has failed to provide the safe premises it is required to furnish under section 2 of the Public Housing Law; that this is an implied covenant of the lease which is a mandate imposed upon the Authority by law. It is urged that in order to insure safety in the Authority’s public housing projects, this policy enunciated in section 2 is also evidenced by the enactment of subdivision 5 of section 402 of the Public Housing Law, in 1967.
The short answer to this latter contention is that the power granted to the Authority to provide for and maintain a housing police department is couched in discretionary terms and is not of a mandatory nature. If a positive and affirmative duty to insure safety were to be imposed upon the Authority in respect to conditions at each of its 150 housing projects in New York City, a statutory provision fixing the number of police officers required to be assigned to each project in relation to the number of tenants, the number of buildings and the incidence of crime at each of the projects would be required. Moreover, it is established law that the mere establishment of a municipal police department of itself does not, ipso facto, create liability on the part of the city in respect to a person who is the victim of a criminal attack (see Motyka v. City of Amsterdam, 15 N Y 2d 134, 139 [1965]), in the absence of exceptional circumstances (Schuster v. City of New York, 5 N Y 2d 75 [1958]).
Tenants have also urged that section 2 of the Public Housing Law imposes a positive duty upon the Authority to furnish “ adequate, safe and sanitary dwelling accommodations for persons of low income ”, and that thereby adequate police protection must be provided by the Authority. However, in clarification of these salutary purposes it is to be observed that the conditions which the quoted objectives of public housing were designed to overcome were “ insanitary and substandard housing conditions owing to overcrowding and concentration of the population, improper planning, excessive land coverage, lack of proper light, air and space, insanitary design and arrangement, or lack of proper sanitary facilities ”.
Article XVIII of the State Constitution, (Public Housing Law, § 2.) which furnished the constitutional basis for public housing in New York, has mandated that provision for low-rent *148 housing, or the clearance, reconstruction and rehabilitation of slum areas, was for the purpose of eradicating “ substandard and insanitary areas. ’ ’
The terms “ safe ” and “ safety ”, where used in a context dealing with deteriorated housing conditions and with the objects of legislation to correct and alleviate such substandard housing conditions, have been defined as being applicable to structural conditions, sanitary conditions, and the elimination of fire hazards (Adler v. Deegan, 251 N. Y. 467, 477 [1929]; Matter of New York City Housing Auth. v. Muller, 270 N. Y. 333, 341, 342 [1936]; Adamec v. Post, 273 N. Y. 250, 254 [1937]; Matter of Murray v. LaGuardia, 291 N. Y. 320, 331-332 [1943]; Fruhling v. Amalgamated Housing Corp., 9 N Y 2d 541, 548 [1961]). The question of providing police protection and safety from criminal elements has never entered into the problem of providing “ adequate, safe and sanitary housing.”
In a recent instance where the Legislature sought to meet the special problem of increased deterioration of housing conditions in New York City, it enacted article 7-A of the Real Property Actions and Proceedings Law. In section 769 it is stated that a special proceeding may be maintained by tenants of a multiple dwelling “ for the purpose of remedying conditions dangerous to life, health or safety ”. In an action brought by tenants under article 7-A, where the tenants claimed, among other things, that their ‘ ‘ safety ’ ’ was endangered by the landlord ’s failure to provide doorman service, the Civil Court of the City of New York held, in Matter of DeKoven v. 780 West End Realty Co. (48 Misc 2d 951 [1965]) that the failure to provide doorman service for a multiple dwelling does not constitute a condition dangerous to safety within the intent and purport of article 7-A. Accordingly, there is no substance to the tenants’ contention that the use of the terms “ safe ” and ‘‘ safety ’ ’ in section 2 of the Publió Housing Law, coupled with the discretionary power of the Authority to maintain a housing police department, imposes a duty upon the Authority under law to insure their safety, and thereby confers a corresponding right in the tenants to bring suit if they .are not satisfied that the alleged duty has been properly discharged by the Authority.
The tenants claim that although there is no express provision in the lease made with the Authority to require the Authority to insure safety in project areas, such a covenant may be implied into the lease. In effect, the tenants request the court to write an additional provision into the lease which the parties themselves have not inserted as part of their agreement. A unilateral expectation by a party to a contract cannot form the *149 basis of a subsequent determination of failure of consideration in respect to that expectation. The court cannot accomplish for the parties that which they did not do for themselves (Morlee Sales Corp. v. Manufacturers’ Trust Co., 9 N Y 2d 16, 19-20 [1961]; Raner v. Goldberg, 244 N. Y. 438, 442 [1927]) except where an “ unforeseen contingency ” has intervened which clearly frustrates the expectations of the parties (Lion Brewery v. Loughran, 131 Misc. 331, 334 [1938], revd. on other grounds 223 App. Div. 623 [1928]). If such a fundamental change in the law as- to insure adequate police protection for tenants in public housing projects is to be effected, it is the function of the Legislature and not the courts to achieve such a fundamental change. (Bliss v. Clark, 104 Misc. 543, 546-547 [1918]; Campo v. Scofield, 301 N. Y. 468, 475 [1950]; Bright Homes v. Wright, 8 N Y 2d 157, 162 [1960] ; cf. Woods v. Lancet 303 N. Y. 349, 354 [1951].)
The Legislature has not been unaware of the need to rectify and to outlaw deteriorated and dangerous housing conditions which have developed in multiple dwellings in New York City. In recent years, it has increasingly enacted specific legislation designed to cope with these deplorable conditions (see Multiple Dwelling Law, § 26, subd. 7-a, providing for lighting in exterior areas during night hours; § 50-a, entrance door locks and intercommunication systems; § 51-a, peepholes; § 51-b, self-service elevator mirrors; § 35, lights for entrance doors; § 37, additional light-power for common halls). In addition, section 755 of the Real Property Actions and Proceedings Law, section 143-b of the Social Services Law, and article 7-A of the Real Property Actions and Proceedings Law, have provided various remedies for tenants in regard to deteriorated and dangerous housing conditions. None of these enactments deal with the obligation of a landlord to provide security personnel for the benefit of tenants to safeguard the property or person of his tenants.
In absence of a specific statutory enactment evincing a clear, unequivocal legislative intent to create a civil cause of action in favor of public housing project tenants against the Authority where it is claimed that their safety by reason of the incidence of crime is endangered and inadequate housing police are assigned to a particular project, the court is without power to imply that a civil cause of action in respect to such an alleged right can be sustained. (See DiCaprio v. New York Cent. R. R. Co., 231 N. Y. 94 [1921]; Sheafer v. Breen, Inc., 263 App. Div. 135 [1941]; Nichols & Co. v. Columbus Credit Corp., 204 Misc. 848, 850, affd. 284 App. Div. 870 [1954]; Aquilino v. United States, 10 N Y 2d 271, 275-276 [1961].)
*150 Although section 235 of the Real Property Law specifically sets forth a list of services and facilities which a landlord is required to furnish to a tenant, and prescribes criminal sanctions for violation thereof, no right of civil action in favor of the tenant arises by reason of the failure of the landlord to comply with these specific, detailed, statutory requirements (Kalfus Co. v. Ad Press, 185 Misc. 214 [App. Term, 1st Dept., 1945]).
The tenants have assumed that because the Authority has undertaken to provide police services In and- about its housing projects, that a duty has thereby arisen on the part of the Authority in respect to its tenants to insure adequate and safe housing conditions at the projects. Although a party may undertake to perform a voluntary act in the role of landlord, such voluntary action is not thereby converted into a legal duty in respect to a particular tenant or tenants to enable a suit or a defense to be based thereon (Fogelson v. Rackfay Constr. Co., 300 N. Y. 334, 340 [1950]; Faron v. Jones, 49 Misc. 47, 49 [1905, Crane, J.]; Elefante v. Pizitz, 182 App. Div. 819, 822 [1918], affd. 230 N. Y. 567 [1920]).
The tenants have urged this court to imply that a breach of the covenant of quiet enjoyment, a constructive eviction, has occurred by reason of the claimed inadequacy of police personnel assigned to their project and to the insecurity that they experienced due to this claimed inadequacy. There are a variety of conditions and circumstances which have been construed by the courts as constituting a constructive eviction and a substantial deprivation of enjoyment of leased premises. Some of these conditions have consisted of noxious odors, lack of heat or water, excessive noise, water leakage, the presence of vermin and the lack of elevator service (1 N. Y. Law of Landlord and Tenant, § 251; 1 Rasch, Landlord and Tenant, §§ 882-903; 33 N. Y. Jur., Landlord and Tenant, §§ 171-178). Inadequate protection has never been construed to constitute a constructive eviction or a breach of the covenant of quiet enjoyment.
In any event, a constructive eviction does not create a cause of action on behalf of a tenant in the circumstances involved in this litigation; it only relieves the tenant of his obligations to the landlord under the lease. Also, by reason of the several requirements established by the Court of Appeals in the Herstem case (Herstein Co. v. Columbia Pictures Corp., 4 N Y 2d 117 [1958]), it is doubtful whether the tenants can claim the benefit of a constructive eviction (see, also, Norwich Realty Affiliates v. Rappaport, 29 A D 2d 814 [1968] and Matter of Osias v. 21st Borden Corp., 29 Misc 2d 680). Accordingly, the court finds it *151 unnecessary to decide whether a public housing tenant must vacate the premises as a condition to claiming the benefit of a constructive eviction against a public housing authority.
The court recognizes that although conditions at the Lillian Wald Houses project may have created a serious concern on the part of the tenants for their personal safety in the face of rampant crime conditions, the alleged inadequacy of the police protection furnished by the Authority is not a matter which is cognizable in the contest of a counterclaim to summary proceeding for nonpayment of rent brought by the Authority as landlord.
The social and political question posed in this litigation is not unlike that which is presently plaguing this city and even the country at large, viz., is there adequate police protection for all the citizens? Comments that the city has become a jungle are frequently heard, and that not only the timorous but the resolute deem it wise to stay indoors when darkness falls. The court is not unaware of the marked increase of crime in this area and opines that perhaps it may be due to the failure to recognize that though the criminal may be entitled to his rights, the victim and the public are equally so entitled. The observation by Judge Cardozo is pertinent: “ Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.” (Snyder v. Masachusetts, 291 U. S. 97, 122 [1934].) There seems to be undue concern about the rights of the transgressor which occasions timidity by the police.
The courts cannot, however, under our governmental system of checks and balances, prescribe conduct or attempt to make administrative decisions for another branch of the government. Indeed, the recent plea of the Chairman of the Authority, before a Congressional Committee apparently went unheeded when he pointed out the inadequacy of the Authority’s police force. However, the questions presented by this litigation involve questions not only of administrative discretion but involve allocations of financial assistance by several departments of government. The courts arc powerless to substitute their judgment for that of the Legislature and of the administrative agencies confided with power to carry out legislative mandates.
The counterclaims are dismissed on the merits, without costs; and final judgment is directed for the landlord in the respective amounts set forth in the stipulations heretofore made by the parties and filed with the court.