CARL BASS, as Administrator of the Estate of LOURDES R. BASS, Deceased, Respondent, *v.* CITY OF NEW YORK, Defendant, and NEW YORK CITY HOUSING AUTHORITY, Appellant.

Second Department, April 3, 1972.

*Francis P. Cunnion* (*John Nielsen* of counsel), for appellant.

*Goldfarb & Greenberg* (*Martin S. Rothman* of counsel), for respondent.

RABIN, P. J. On this appeal in an action by an administrator to recover damages for the wrongful death of his intestate (his daughter) and for her conscious pain and suffering, the issue to be determined is whether the appellant, the New York City Housing Authority, is liable in negligence for the injuries and tragic death of the intestate resulting from a rape and homicide. This issue was determined adversely to the appellant after a nonjury trial.

The decedent, Lourdes R. Bass, an infant nine years of age, resided with her parents in a 14-story building which was one of 10 buildings comprising a housing project owned, operated, maintained, supervised and controlled by the appellant on a 16-acre site known as the Farragut Housing Project, a low rent public housing project operated pursuant to the Public Housing Law. On December 4, 1962, at approximately 12:30 P.M., the decedent, having finished her lunch, was returning to her school, which was located six blocks from the housing project. Using a rear entrance hallway to reach the street, she was seized by a 15-year-old boy who resided in another building in the project. The decedent was taken to the roof of the building where she was stripped of her clothing and raped. The assailant then held her over the edge of the roof and suspended her 14 stories above the street, until she promised not to disclose the incident. When she was put back on the roof, she broke away, with her assailant in pursuit. After a scuffle, he again seized her and again held her over the edge of the roof. He shook her repeatedly and finally dropped her at approximately 12:55 P.M. She fell 14 stories to the pavement of the courtyard and died of the resultant injuries.

It was stipulated at the trial that the appellant "pursuant to the Public Housing Law pertaining to the Housing Authority undertook to provide and maintain a Housing Police Department and a uniformed Housing police force." It was further stipulated that on December 4, 1962, one housing officer was assigned to this 10-building project; at the time of the rape and homicide the officer was at lunch; prior thereto he had patrolled the rear entrances and lobbies and inspected four buildings throughout, including the roofs; he was aware that there were elementary and junior high schools nearby and knew that children came home for lunch between 12:00 noon and 1:00 P.M.; on the roofs of three of the buildings, other than the one in which the decedent lived, there were telephone call boxes which, when in use, activated flashing lights for the purpose of attracting the attention of a police officer; and the housing officer in question first became aware of the crime following a call from headquarters. It was also stipulated that prior to December 4, 1962, this project had a history of incidents of unlawful and criminal acts ranging, *inter alia,* from malicious mischief to robbery, narcotics, assault, rape and homicide, involving both adults and children, all of which were reflected in official records of complaint for the years 1960 to 1962, and that one-half hour before the instant rape and homicide, a seven-year-old girl residing in the same building was accosted in one of the elevators and taken to the basement where an attempt to remove her clothing was frustrated by her escape.

The testimony of three officers, called as witnesses for the plaintiff, is pertinent. One of them, a New York City policeman in charge of patrol assignments at the precinct located in the area in which the project is situated, testified that, although no city police officers were assigned to patrol the inside of the project and under normal circumstances the city police did not go inside the project unless requested or unless a crime was being committed, this policy was not limited to buildings owned by the appellant but was one which was followed with respect to all buildings in the area. A second witness, a patrolman employed by the appellant, testified as to his understanding that the appellant, at no time, excluded the New York City Police Department from patrolling the area. The third witness, an official of the Housing Patrolmen's Benevolent Association, testified that he had seen members of the city police force walking on the "outside of the perimeter" of the housing project.

Upon the foregoing, the trial court awarded judgment to the plaintiff in the sum of $100,000 on the cause of action for pain and suffering and in the sum of $35,000 on the cause of action for wrongful death. Briefly stated, the court determined that the appellant was a landlord charged with the same responsibilities as any other landlord in this city and, having undertaken to organize and maintain a housing police force, owed a duty or obligation to each of the residents of the housing project to use reasonable care in providing police protection. In the words of the court: " The Housing Authority knew that crime was rampant within the confines of its project. It had assumed the burden of protection by establishing a police force. It did not fulfill its obligation by assignment of one man to provide such protection." Additionally, the court concluded that the operation of these housing projects was in the nature of a private enterprise with an indicated special responsibility, stating: " I firmly believe that a landlord of a privately sponsored and maintained housing complex such as this, with a similar history of crime and disorder, should bear a special responsibility to protect its residents from these lawless elements."

The threshold question is whether the appellant owed a duty specifically to the decedent as a resident of the project to afford her adequate police protection so as to safeguard her against the criminal act which caused her death. If there was no such legal duty, the dependent issues of proximate causation and the intervening act of a third party are rendered academic.

The New York City Housing Authority is a public corporation organized under the Municipal Housing Authorities Law (L. 1934, ch. 4, comprising §§ 60 to 78, inclusive, of the former State Housing Law [L. 1926, ch. 823, as re-enacted by L. 1927, ch. 35], now the Public Housing Law [L. 1939, ch. 808]) and engaged, pursuant to article XVIII of our State Constitution and the Public Housing Law, in the construction and operation of public low rent housing projects (*Matter of Corwin* v. *Farrell*, 303 N. Y. 61, 63; *Matter of New York City Housing Auth.* v. *Muller*, 270 N. Y. 333). It is a " corporate governmental agency " (Public Housing Law, § 3, subd. 2) and is deemed to be an agency of the municipality in which it is established (1943 Opns. Atty. Gen. 232; New York City Administrative Code, § E46–3.0). While it enjoys an existence as a public authority separate and apart from the State and the municipality, it exercises a governmental function (cf. *Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn.* v. *New*

*York State Thruway Auth.,* 5 N Y 2d 420, 424; *Ciulla* v. *State of New York,* 191 Misc. 528) and is "to some extent responsive to municipal policy" (*Kelly* v. *Cohoes Housing Auth.,* 27 A D 2d 463, 465).

The modern city functions in the public interest as proprietor and operator of a number of activities formerly and in some instances still carried on by private enterprise (*Matter of New York City Housing Auth.* v. *Muller, supra,* p. 342). Many of these activities may be carried on directly by the State or the municipality, even though they create and use a corporation for that purpose, or may be delegated to an independent agency such as the appellant Authority (Public Housing Law, § 1 *et seq.;* cf. *Pantess* v. *Saratoga Springs Auth.,* 255 App. Div. 426). It may well be, in certain instances, that to the extent the appellant is carrying out activities which traditionally have been engaged in by private landlords it is performing a corporate function and acting in a proprietary capacity and the imposition of liability on established principles of tort law would logically follow (see Ann. 61 ALR 2d 1247). However, in determining the extent and scope of the appellant's duties as a landlord, we must "distinguish those liabilities attendant upon governmental activities which have displaced or supplemented traditionally private enterprises" (*Riss* v. *City of New York,* 22 N Y 2d 579, 581) and are performed in a proprietary capacity from those which are and have always been considered governmental in nature. In this respect we note that there are no powers or duties which can be conferred and imposed upon a municipality that more clearly "constitute a function of general government than the power and duty to maintain a police force" (*Wilcox* v. *City of Rochester,* 190 N. Y. 137, 142).

The operation of a police department is universally regarded as a governmental activity and, in the absence of other circumstances sufficient to indicate negligence, the failure to provide general police protection, or adequate protection, will not impose liability upon a municipality, even though a statute or judicial ruling has abrogated the municipal immunity for the torts of policemen (18 McQuillin, Municipal Corporations [3d ed. rev.], §§ 53.79–53.80). Despite the waiver of sovereign immunity by section 8 of the Court of Claims Act, which made municipalities answerable equally with individuals and private corporations for the wrongs of its officers and employees (*Bernardine* v. *City of New York,* 294 N. Y. 361, 365), the "rule is that, independent of sovereign immunity, a municipality is not liable for failure to supply general police or fire protec-

tion '' (*Motyka* v. *City of Amsterdam,* 15 N Y 2d 134, 138). As stated by the Court of Appeals in *Weiss* v. *Fote* (7 N Y 2d 579, 586–587) : '' it was the legislative design that, *in respect of its legal status,* the State be treated like any individual or corporation. This is far different from saying, however, that the Court of Claims Act places the State on a parity with private corporations or individuals *in respect of all of its defenses* '' (emphasis in original).

Prior to the occurrence of the incident at bar and pursuant to the general powers set forth in section 37 of the Public Housing Law there was in existence a housing officer force of the New York City Housing Authority. The personnel of that housing officer force were recognized as having '' peace officer '' status (Code Crim. Pro., § 154). Subdivision 1 of section 32 of the Public Housing Law gave to the local legislative body of the City of New York the power to approve or disapprove the compensation of the appellant's employees (*Nolan* v. *New York City Housing Auth.,* 199 Misc. 599, affd. 278 App. Div. 762; *Montebello* v. *New York City Housing Auth.,* 13 Misc 2d 180) and recognition of the existence of this housing police force and of the city's responsibility to participate in subsidizing its maintenance is reflected in resolutions of the Board of Estimate of the City of New York such as that adopted on March 22, 1962, wherein the sum of $2,500,000 was allocated out of the appropriations for the fiscal year 1961–62, specifically for '' payment to New York City Housing Authority to provide policing costs.'' In 1962 subdivision 6 of section 154 of the Code of Criminal Procedure was amended so as to substitute the words '' a member of the uniformed force of the New York city housing authority police '' for '' a member of the housing officer force of the New York city housing authority '' (L. 1962, ch. 833, eff. July 1, 1962). In 1963 section 154-a was added to that code, designating as police officers certain peace officers, including members of a duly organized police force or department of an '' authority '' such as the appellant (L. 1963, ch. 581). In 1966 the Legislature enacted a statute directing that the '' housing police service of the New York city housing authority '' be divided into platoons by the '' commissioner of police, superintendent of police, chief of police, or other officer or officers, having the management, control or direction [thereof] '' (L. 1966, ch. 1005); and in 1970 the Legislature amended the last mentioned statute, but only to change the platoon system to one of '' duty charts '' (L. 1970, ch. 788). Finally, in 1967 section 402 of the Public Housing Law was

amended by adding subdivision 5, which vested the appellant with "discretion to provide and maintain a housing police department and a uniformed housing police force" and further vested such police force with certain powers, authority and jurisdiction, among which are included the power and duty, in and about the public housing facilities, "to preserve the public peace, prevent crime, detect and arrest offenders," to "protect the rights of persons and property" and "for these purposes to arrest all persons guilty of violating any law or ordinance" (L. 1967, ch. 734).

Accordingly, although the trial court and the attorneys for the respective parties erroneously treated subdivision 5 of section 402 of the Public Housing Law, enacted in 1967, as being applicable to the causes of action herein, which arose in 1962, it appears from all the foregoing that for many years prior to the enactment of that subdivision, and as of and prior to the date of the incident which resulted in the decedent's death, the maintenance by the appellant of its police force constituted a governmental operation analogous to, if not equal in scope and authority to, the police force of the municipality itself. While the legislation enacted subsequent to 1962 as heretofore noted, including subdivision 5 of section 402 of the Public Housing Law, accorded to the appellant's personnel "police officer" status and defined and appears to have enlarged the specific powers and duties of its personnel in and about its housing facilities, that legislation also served to recognize and confirm the prior existence of the "uniformed force of the New York City housing authority police" (Code Crim. Pro., § 154) and the governmental nature of its function.

It is well settled that a municipality, acting in its governmental capacity for the protection of the general public, cannot be cast in damages for a mere failure to furnish adequate police protection to a particular individual to whom no special duty is owed (*Motyka* v. *City of Amsterdam*, 15 N Y 2d 134, *supra*; *Steitz* v. *City of Beacon*, 295 N. Y. 51; *Murrain* v. *Wilson Line*, 270 App. Div. 372, affd. 296 N. Y. 845; cf. *Schuster* v. *City of New York*, 5 N Y 2d 75). It seems clear to us that, under the circumstances at bar, the appellant's maintenance of a police force, although primarily limited to the housing project, was such as to bring that governmental function within the purview of this rule and that, absent special circumstances creating a legal obligation to provide police protection to the decedent individually, there is no basis for imposing liability upon the

414

appellant solely by reason of the decedent's status as a resident of the project (cf. *Matter of New York City Housing Auth.* v. *Jackson,* 58 Misc 2d 847; *New York City Housing Auth.* v. *Medlin,* 57 Misc 2d 145, affd. 64 Misc 2d 857).

Moreover, we find no anomaly in distinguishing between the proprietary and governmental functions to be performed by the appellant (cf. *Woodhull* v. *Mayor,* 150 N. Y. 450). "To hold that the Bureau of Buildings may and does act in a dual capacity does not result in any inconsistency. When it approves or disapproves plans for the construction of buildings it may be held to perform a public or governmental function; when it takes action and expends municipal funds for the purpose of rendering a highway safe, it may be held to be engaged in a corporate function" (*Oeters* v. *City of New York,* 270 N. Y. 364, 368).

We also do not agree that there was any assumption of a special duty as indicated by the trial court when it reasoned, albeit on the erroneous assumption, that subdivision 5 of section 402 of the Public Housing Law was applicable, that the appellant not only had voluntarily assumed the duty of policing the housing project, but actually had reduced the degree of protection that might have otherwise been afforded to the tenants, by entering into a "tacit understanding" with the city police that the latter would not patrol the inside of the project but only the perimeter thereof, thereby establishing some special relationship on the part of the appellant to each of its tenants and creating a legal duty to use reasonable care for their individual benefit. In our opinion, there is no support for the court's rationale and conclusion as to the actual assumption by the appellant of a legal duty to the decedent or as to any implied assumption of the total police function based upon any "tacit understanding" to exclude the city police from the housing project. On the contrary, the testimony of the plaintiff's witnesses clearly established that the policy of remaining outside the project unless otherwise requested was followed with respect to all buildings in the area and that the appellant, at no time, excluded the city police from patrolling the project. Moreover, a close reading of the applicable statutory provisions clearly indicates that it was not the legislative intent to have the housing police department assume the *total* police function at the appellant's project, but rather it was intended that the powers of the housing police were merely to *supplement* the mandated authority of the New York City police.

Section 101 of the Public Housing Law, although enacted in 1963 (L. 1963, ch. 878), subsequent to the events herein, was designed to clarify the pre-existing municipal responsibility and clearly expresses such legislative intent by providing that "a municipality shall, irrespective of the boundaries of a project, provide for the tenants of such project, police, fire and health protection services of the same character and to the same extent as those provided for other residents of the municipality."

It is our view, therefore, that the Legislature never intended, by its legislation enacted prior to the date of the incident and subsequent thereto, including subdivision 5 of section 402 of the Public Housing Law, to impose upon the appellant any greater burden or responsibility with respect to its police force than that which through an unbroken chain of decisional law has been imposed upon a municipality's police force and no basis exists for the court's conclusion in this respect predicated on any theory of assumption. Nor is there any basis for the plaintiff's contention in a similar vein when he seeks to bring his case within the orbit of the principle that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all" (*Glanzer* v. *Shepard,* 233 N. Y. 236, 239).

The cases relied upon by the trial court are inapposite and distinguishable from the facts and issues at bar and do not support the conclusion that a special duty of protection was owed to the decedent. *Schuster* v. *City of New York* (5 N Y 2d 75, *supra*) merely fixes one of the special circumstances in which a failure to provide police protection is actionable. In that case, the plaintiff's intestate had furnished information to the police leading to the arrest of a dangerous fugitive. After having afforded police protection to the intestate for some time, the police department discontinued it and, a short time thereafter, the plaintiff's intestate was shot and killed. Our Court of Appeals, in sustaining the legal sufficiency of the complaint, held, *inter alia,* that having called upon persons in possession of any information regarding the whereabouts of the fugitive to communicate such information in aid of law enforcement, "the public * * * owes a special duty to use reasonable care for the protection of persons who have collaborated with it in the arrest or prosecution of criminals, once it reasonably appears that they are in danger due to their collaboration" (pp. 80–81). The court concluded that special circumstances were present not only because unusual danger could readily be seen to be imminent but also because a failure to provide pro-

tection under such circumstances would discourage citizens from giving information to the police and hence decrease the efficiency of law enforcement.

In *Abbott* v. *New York Public Library* (263 App. Div. 314) the plaintiff was assaulted in a public library. The defendant knew that the same assailant had three days before in the same library made an unjustified assault with a knife on another visitor. The defendant allowed the assailant to go at large without even notifying the police. On the day the plaintiff was assaulted the defendant's guards allowed the assailant, armed with a hatchet, to again enter the library. No warnings or instructions of any kind with regard to the assailant had been given to the attendant in the room where the plaintiff was assaulted. Under these circumstances, which involved a known danger presented by a specific individual known to the defendant and its personnel, the court held that the defendant owed to persons using the library '' the duty of ordinary care and reasonable supervision so that such patrons would not be unreasonably exposed to dangers including dangers known to defendant but not to its invitees '' (p. 319).

In *Caldwell* v. *Village of Island Park* (304 N. Y. 268) the injury sued upon was caused by exploding firecrackers set off in the defendant's park on Independence Day. The court held that the operation of a public park by a municipality is a *quasi-private or corporate and not a governmental function* and, therefore, the defendant owed to those using the park facilities a duty of reasonable and ordinary care against foreseeable dangers. In that case, since there was repeated exploding of firecrackers over a considerable period of time preceding the accident, the defendant should have anticipated that these activities would continue and perhaps be increased on the day of the plaintiff's injuries — Independence Day.

In *Amoruso* v. *New York City Tr. Auth.* (12 A D 2d 11) the plaintiff was assaulted in a subway station and the court held the defendant to the standard of care of a railroad carrier charged with the duty to take reasonable precautions for the protection and safety of its passengers.

Finally, in arriving at our conclusion, we are mindful of the philosophy expressed by eminent jurists that '' the time has come to remove from our law all the remaining vestiges of governmental immunity '' (dissenting opinion of Desmond, Ch. J., in *Motyka* v. *City of Amsterdam*, 15 N Y 2d 134, 141, *supra*) and that, to the extent an injury results from a failure to allo-

cate sufficient funds and resources to meet a minimum standard of public administration, public officials must either improve public administration or accept the cost of compensating injured persons (dissenting opinion of KEATING, J., in *Riss* v. *City of New York*, 22 N Y 2d 579, *supra*). This rationale was reflected in the trial court's opinion in the instant case when it stated, in effect, that, on balance, the economic burden of providing an adequate police force is of far less significance than the sufferings of the victim exposed to inadequate protection and that it is "high time" that such a burden be assumed.

Perhaps the time will come when these minority views will be transformed into the law of this State. However, such is not the present state of the law. In *Steitz* v. *City of Beacon* (295 N. Y. 51, 55, *supra*) the court said, "An intention to impose upon the city the crushing burden of such an obligation should not be imputed to the Legislature in the absence of language clearly designed to have that effect." More recently, the Court of Appeals stated: "The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed. For the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits. * * * Before such extension of responsibilities should be dictated by the indirect imposition of tort liabilities, there should be a legislative determination that that should be the scope of public responsibility * * *. To foist a presumed cure for these problems [increased crime] by judicial innovation of a new kind of liability in tort· would be foolhardy indeed and an assumption of judicial wisdom and power not possessed by the courts. * * * For all of these reasons, there is no warrant in judicial tradition or in the proper allocation of the powers of government for the courts, in the absence of legislation, to carve out an area of tort liability for police protection to members of the public" (*Riss* v. *City of New York*, 22 N Y 2d 579, 581–583, *supra* [bracketed matter supplied]).

Accordingly, while we share the trial court's concern over this unfortunate incident and we recognize the sympathetic perspective in which this case should be viewed, we are constrained to hold that the result reached below cannot be sustained under the law as presently constituted.

The judgment should be reversed, on the law, without costs, and the complaint dismissed. The findings of fact below have not been affirmed.

GULOTTA, J. (dissenting). I would affirm the judgment in favor of the plaintiff but drastically reduce the amounts awarded to a level consonant with our rules controlling damages in actions of this kind. I agree with the finding by the trial court that the proof of negligence was overwhelming. The security measures adopted were meaningless in view of the known dangers with which they were intended to cope. When coupled with the known fact that the very existence of the appellant's private police force would greatly curtail, if not entirely eliminate, patrolling by the New York City public police force, the appellant's measures were completely inadequate to meet a standard of ordinary prudence. I agree that this is not a *Schuster* type of case and that it does not meet the special standards required by *Motyka* v. *City of Amsterdam* (15 N Y 2d 134) vis-à-vis the City of New York, were this action founded upon a failure by the City Police Department. However, in my opinion, the Housing Authority exercises a proprietary function in the operation of its housing project and in its corporate capacity it is subject to the same tests of liability that a private landlord would be who undertook to provide security for its tenants and then abysmally failed to do so. The question of what is proprietary and what is governmental is a clouded one, often not easily determined. Warren's Negligence (vol. 2C, pp. 214–215) states: " [c] — Proprietary Functions. Functions considered proprietary in nature include illustratively, maintenance of parks and playgrounds, including zoos and swimming pools; *ownership and maintenance of land, buildings and structures not intended for use for purely governmental purposes*; operation and maintenance of parking lots; maintenance of water works and water supply systems for the purpose of furnishing water to residents of the municipality, as distinguished from a water system maintained for the purpose of protecting the city against loss by fire; construction and maintenance of sewers and sewerage systems, except in case of failure to provide any sewers at all for fire protection; and operation and maintenance of transportation systems " (emphasis added). New York Jurisprudence (39 N. Y. Jur., Municipal Corporations, § 186) is to the same effect. As to the legal consequences of this, that work (40 N. Y. Jur., Municipal Corporations, § 971, p. 219) states: " Insofar, however, as a munici-

pal corporation acted in its private or proprietary capacity, the general rule was that it was liable in tort in the same manner as a private corporation.'' However, it is not necessary for us to resolve this thorny question in order to dispose of this case, since even if public housing be considered a general governmental function, the effect of the waiver of sovereign immunity accomplished by the Court of Claims Act mandates that we treat the Housing Authority just as we would treat any private landlord (*ibid.*, § 972; 4C Warren's Negligence, p. 87).

It is true that the courts have engrafted on the waiver of immunity an exception for what is called a *pure* governmental function, i.e., police and fire protection (2C Warren's Negligence, p. 223; 40 N. Y. Jur., Municipal Corporations, § 972). However, this also has its limitations. (See *Dunham* v. *Village of Canisteo,* 303 N. Y. 498; *Koeppe* v. *City of Hudson,* 276 App. Div. 443; and *Bernardine* v. *City of New York,* 294 N. Y. 361, where municipalities were held liable for the negligence of the public police department.)

I can discern no compelling public policy reasons to extend by implication this broad cloak of immunity to the private police force set up by the Housing Authority. As to the circumstance that it was done pursuant to law, it could not have been established without authorization of law and the fact that it was so authorized by statute does not equate it to the public police force of the city. Actually I see it as no different from a case where a private landlord might hire a private detective agency to patrol his housing development.

It is well settled that when a person voluntarily assumes the performance of a duty he is required to perform it carefully although he could have avoided all liability by never having undertaken the task initially (41 N. Y. Jur., Negligence, § 22).

We have an almost exact analogy to our case in *Amoruso* v. *New York City Tr. Auth.* (12 A D 2d 11), where the First Department applied the rules of ordinary negligence to a case involving the alleged dereliction of the transit police force maintained by the defendant public Transit Authority under the authority of subdivision 16 of section 1204 of the Public Authorities Law. That law very closely parallels subdivision 5 of section 402 of the Public Housing Law which was assumed by the trial court to govern in the instant case. As the majority opinion points out, at the time of this incident in 1962 the housing police force was operating under the general powers set forth in section 37 of the Public Housing Law and it was not until 1967 that the specific provisions of subdivision 5 of sec-

tion 402 came into being. However, this was merely a restatement in more precise terms of what had been the situation for years under the general statute and does not, in my opinion, detract from the theme that from its inception this was not part of the public police force; nor was it at the time of this unfortunate occurrence; nor is it today. In principle the housing police force is indistinguishable from the transit police force and should be treated like it for purposes of determining liability in a case such as this.

The circumstance that is important is not the nature of the act itself, but who is performing it. Anyone can put out a fire, but it is not a governmental function unless it is the fire department which is doing it. For instance, were this appellant to allow its fire fighting equipment in the building to remain out of order and unusable and damage resulted therefrom, I believe it would have to answer therefor, albeit fire fighting, when performed by a city fire department, is a *pure* governmental function also.

HOPKINS, MARTUSCELLO and LATHAM, JJ., concur with RABIN, P. J.; GULOTTA, J., dissents and votes to modify the judgment by reducing the amounts of the recovery awarded to plaintiff and to affirm the judgment as so modified, with an opinion.

Judgment of the Supreme Court, Kings County, entered June 19, 1970, reversed, on the law, without costs, and complaint dismissed. The findings of fact below have not been affirmed.