Remy BIZIEN, Plaintiff,

v.

The PORT AUTHORITY OF the STATES OF NEW YORK AND NEW JERSEY, British Airways and IBI Security Services, Inc., Defendants.

Evan GOODSTEIN and Lorraine Goodstein, Plaintiffs,

v.

BRITISH AIRWAYS and IBI Security Services, Inc., Defendants.

BRITISH AIRWAYS, Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendants.

Nos. 82 CIV 0417, 82 CIV 0513.

United States District Court, E.D. New York.

July 8, 1983.

Glabman, Rubenstein, Reingold & Roth-bart, Brooklyn, N.Y., for plaintiff Bizien.

Moskowitz & Passman, New York City, for plaintiffs Goodstein.

Moore, Berson, Lifflander & Mewhinney, Garden City, N.Y., for defendant British Airways.

Patrick J. Falvey, New York City, for defendant Port Authority.

Wilson, Elser, Edelman & Dicker, New York City, for defendant IBI Sec.

## OPINION AND ORDER

McLAUGHLIN, District Judge.

On September 26, 1981, a group of protesters gathered at the British Airways Terminal at Kennedy Airport to demonstrate against the South African Rugby Team known as the "Springboks." The protesters mistakenly believed that the soccer team was scheduled to return to South Africa that day.

A significant force of New York Port Authority Police was on hand when the protesters, who had until then been peaceful, broke from a lounge area and bolted for the British Airways gate. In the ensuing melee one of the protesters, Donna Borup, now a fugitive, hurled a caustic solution at Evan Goodstein, a Port Authority policeman who was trying to handcuff her. The solution splattered Goodstein in the face, and some of it also hit Remy Bizien, an employee of South African Airways, who had intervened in the fracas to subdue another demonstrator.

Both victims brought separate personal injury actions that were later consolidated. The defendants are the Port Authority of the States of New York and New Jersey (hereinafter the "Port Authority"), British Airways, and the IBI Security Service, Inc. (hereinafter "IBI"). After a bench trial, I find for the defendants.

FACTS

THE PARTIES

Remy Bizien is a French citizen and a resident of New York. On September 26, 1981, he was employed by South African Airways as a catering coordinator and, in the course of this employment, was at the British Airways Terminal at John F. Kennedy International Airport. Similarly, Evan Goodstein, a citizen of the United States, and a resident of New York, was employed as a police officer by the Port Authority and, in the course of his employment, he too was at the British Airways Terminal.

British Airways is a foreign corporation and is a wholly owned subsidiary of the British Government. It operates an airline providing regularly scheduled service throughout the world and serving New York City through John F. Kennedy International Airport. British Airways maintains a terminal building at John F. Kennedy International Airport, the British Airways Terminal.

The Port Authority of New York and New Jersey is a body corporate and politic, created by compact between the States of New York and New Jersey with the consent of the Congress of the United States and, as such, is an agency of both the States of New York and New Jersey. As part of its governmental function, The Port Authority maintains and operates its own police force, all the members of which are police officers in both the State of New York and the State of New Jersey.

IBI is a New York corporation which supplies for hire guards and other security personnel. On September 26, 1981, IBI was under contract (plaintiff's Exhibit 5) to supply guards and other security personnel to British Airways for stationing at posts in the British Airways Terminal.

The British Airways Terminal at John F. Kennedy Airport is constructed on land that British Airways has leased from The Port Authority (and, in turn, The Port Authority has leased from the City of New York). British Airways itself does not own

the terminal, but rather it occupies the terminal pursuant to a lease agreement with BDL Properties, Inc., the developer. British Airways subleases portions of the terminal to other air carriers, shops, newsstands, and concessions.

The departure level of the British Airways Terminal is arranged with ticket counters and check-in facilities near the front entranceways. Behind these facilities, is a lounge in which passengers may rest prior to boarding their flights, and in which persons may await the arrival of in-coming flights. This lounge is an open, public area surrounded by shops and concessions and is a hubbub of activity when aircraft are arriving and departing from the terminal. From this lounge, two ramps—the North Ramp and the West Ramp—lead to the gates at which the aircraft are parked.

THE INCIDENT

During September 1981, a South African rugby team, commonly known as the "Springboks", was touring the United States. Wherever it went, the team attracted noisy attention because of the political turmoil in South Africa. The team was scheduled to return to South Africa during the latter part of September, 1981 on a South African Airways flight scheduled to depart from the British Airways Terminal.

On September 26, 1981, Leonard J. Levy, British Airways' senior security officer on duty (and a retired New York City detective), received information sometime between 2:00 P.M. and 3:00 P.M. that a demonstration might occur at the terminal. When he learned that the demonstrators had entered the building, Mr. Levy telephoned The Port Authority Police Department to ask for police assistance. (A few days earlier, the Port Authority had received a warning from the New York City Police Department to expect trouble at the terminal.) Mr. Levy then advised his fellow security officers that demonstrators might already be in the terminal; later he patrolled the departure lounge, where he anticipated the demonstrators might congregate. Mr. Levy decided against summoning extra guards from IBI because IBI guards are not trained in crowd control procedures.

Responding to Mr. Levy's telephone call, The Port Authority dispatched nineteen (19) police officers, including both plain clothes and uniformed officers. When the police arrived at the British Airways Terminal, British Airways Security had identified a group—approximately 40 to 50 in number—of non-passengers seated in the lounge on the departure level of the British Airways Terminal. The group was comprised predominantly of females, and included many small children. The group was seated in a public, unrestricted area of the lounge, and was quiet and orderly.

As soon as the police arrived at the British Airways Terminal, Mr. Levy spoke with Lieutenant Brown and Sergeant Sweet of the Port Authority Police Department and pointed out the group of persons in the lounge who appeared to be demonstrators. Mr. Levy discussed with the officers the possibility of moving the group out of the terminal and all agreed that Lieutenant Brown should speak with the person who appeared to be leading the group. Lieutenant Brown spoke with a woman carrying a bullhorn and offered her a location outside the terminal in which to demonstrate. The offer was refused.

During this period, British Airways conducted normal boarding operations at the terminal, using the north ramp from the departure level. While passengers for the South African Airways flight were boarding, the Port Authority Police and British Airways Security positioned themselves in various locations throughout the lounge on the departure level of the terminal, and near the north ramp, and had the group under constant surveillance.

Present at the terminal were at least 19 Port Authority police officers and two British Airways Security Officers. In addition, a uniformed guard employed by IBI stood at the base of the north ramp. The unarmed, uniformed guard was responsible for checking boarding passes and luggage of passengers moving from the departure

lounge to the gate area. He had no other security responsibilities.

Sometime during the early evening, but after the Port Authority Police had arrived and taken control of the scene, the group of demonstrators began to assemble and walk past the base of the north ramp. This group began to chant various slogans directed against the South African government and its policies. Then, suddenly, abruptly, and without any warning, a small group of persons, estimated at between three to eight in number, broke from the main group and raced up the north ramp. British Airways Security officers and Port Authority police attempted to restrain these persons and were successful in preventing them from reaching the passengers and aircraft in the gate area.

Plaintiff, Remy Bizien, who was wearing his British Airways uniform, happened to be on the ramp at the time. He saw one male, later identified as Timothy Blunk, running up the ramp toward the gate. Bizien tried to stop Blunk while Officer Goodstein was scuffling with a female, subsequently identified as Donna Borup. Borup threw a caustic solution in their direction, and both Bizien and Goodstein were splattered with it. They now sue for their injuries.

Everyone who charged the ramp and fought with the police was arrested. Each was subsequently indicted on various criminal charges, and with the exception of Donna Borup, each was convicted in the courts of the State of New York and was sentenced to a prison term. Donna Borup, who was identified as the demonstrator who threw the liquid at Evan Goodstein and Remy Bizien, forfeited her $10,000 bail; and there is a warrant for her arrest as a fugitive from justice.

## THE LAW

■ Before turning to the specific theories of liability urged by the plaintiffs, a few preliminary observations may prove helpful. To begin with, it is well to note

that although the British Airways Terminal at John F. Kennedy International Airport is private property (see *Marriott In-Flite Services, Inc. v. Rosado*, 70 Misc.2d 423, 424, 333 N.Y.S.2d 114, 155 (Sup.Ct.N.Y. County), *aff'd* 43 A.D.2d 1020, 353 N.Y. S.2d 924 (1st Dep't 1974), the terminal fulfills an important public purpose—serving as a port of entry into the United States and containing shops and concessions. It is, accordingly, public in nature; and "an individual has a right to enter and remain in that building unless he engages in some unlawful activity." *People v. DeClemente*, 110 Misc.2d 762, 765, 442 N.Y.S.2d 931, 935 (N.Y.C.Crim.Ct. Queens County 1981).

■ Similarly, the departure lobby of the British Airways Terminal is a public forum. *See also Fernandes v. Limmer*, 663 F.2d 619, 626 (5th Cir.1981). The right to communicate in a public forum "may be regulated in the interests of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." *Fernandes v. Limmer*, 663 F.2d 619, 627 (5th Cir.1981), *quoting Hague v. C.I.O.*, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

## 1. DEFENDANT PORT AUTHORITY

Plaintiff Bizien rests the liability of the Port Authority upon two foundations: a statutory cause of action and common-law negligence.[1]

New York General Municipal Law § 71–a creates a cause of action for any person who, at the command of a police officer, assists in effecting an arrest and who is injured in the process. The cause of action lies "against the municipal corporation" that employed the police officer. Plaintiff Bizien seeks to invoke this statute.

■ It is, in the first place, by no means clear that this statute applies to the Port Authority. The General Municipal Law applies to a municipal corporation which by

1. Plaintiff Goodstein has not sued the Port Au-          thority, his employer.

statutory definition, includes "*only* a county, town, city and village." Gen.Mun.Law § 2 (emphasis added).

In *Bender v. Jamaica Hospital*, 40 N.Y.2d 560, 562, 388 N.Y.S.2d 269, 270, 356 N.E.2d 1228, 1229 (1976); the New York Court of Appeals focused upon the word "only" in the statutory definition:

> The use of the word 'only' in the definition of municipal corporation creates a certain and definite restriction on the meaning of that term, which precludes the judicial inclusion of a public benefit corporation.

Plaintiff Bizien would extend the provisions of the General Municipal Law to the Port Authority because the latter performs a "governmental function." But in *Bender, supra*, the Court of Appeals refused to extend the statute to the New York City Health and Hospital Corporation, even though it too performed a governmental function. I am gravely doubtful, therefore, that the strict liability provisions of Section 71–a of the General Municipal Law may be extended to the Port Authority.

■ I need not, however, rest my decision on so frail a reed as statutory construction. Even if the statute were applicable to the Port Authority, the plaintiff would have the burden of proving that the statute controls this case. This he has failed to do.

Bizien testified at trial that his intervention during the incident was prompted by a command shouted by one of the police officers present to "stop him"—the "him" being an onrushing demonstrator. No witness (other than Bizien himself) however, testified that he heard anyone on the north ramp call out words to that effect at the time of the incident. Officer Goodstein, who was present on the ramp, testified that he heard no such call. Moreover, plaintiff's trial testimony should be compared with his pre-trial deposition.

Mr. Bizien, on page 50, lines 20 through 25 of his deposition, explained his motivation for intervening in the melee as follows:

Q. Is there any particular reason why you would have attempted to tackle an individual coming up the ramp?

A. I've got on a South African uniform and there were people coming up that ramp; I wasn't sticking around. I had to do something, you know.

Plaintiff Bizien was asked during cross-examination at trial why he had never previously stated that he had responded to a police officer's call. His answer was that "he was never asked." That response, however, is simply too facile. His deposition testimony clearly indicates that he had been given a full opportunity at his deposition to mention the alleged call for aid by a police officer at the scene.

It should also be noted that even Mr. Bizien was unable to identify the voice he purportedly heard as having been that of a Port Authority police officer. I, therefore, find as a fact that the plaintiff Bizien has failed to prove that any police officer called for Bizien's assistance.

Plaintiff Bizien's second theory of liability is that the Port Authority owed a duty to afford him adequate police protection. The argument fails, however, because in the absence of a special relationship between the Port Authority (as an arm of the State) and the plaintiff, there is no cause of action for failure to provide police protection.

The Port Authority is a bi-state governmental agency created by Interstate Compact between the States of New York and New Jersey, which Compact was consented to by the Congress of the United States. Chapter 154 Laws of New York, 1921; Chapter 151 Laws of New Jersey 1921; 42 U.S.Stat. 174 (1921). The Port Authority, pursuant to the 1921 Compact and implementing bi-state legislation, has constructed and operated various terminal, transportation and other facilities of commerce in the bi-state Port District, including John F. Kennedy Airport.

The legislation empowering the Port Authority to establish, maintain, and operate air terminals in the bi-state Port District clearly indicates that the Port Authority is

performing an essential governmental function. Section 6634 of McKinney's Unconsolidated Laws of New York provides in this regard as follows:

> The effectuation, establishment, acquisition, construction, rehabilitation, improvement, maintenance and operation of air terminals by the Port Authority is and will be in all respects for the benefit of the people of the states of New York and New Jersey, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions; and the Port Authority shall be regarded as performing an essential governmental function in undertaking the effectuation, establishment, acquisition, construction, rehabilitation, improvement, maintenance or operation thereof, and in carrying out the provisions of law relating thereto.

N.Y.Unconsol.Laws (65) § 6634.

The Port Authority, in performing its governmental functions in operating various facilities in the States of New York and New Jersey, operates its own police division which employs men and women as police officers. The Port Authority police officers are officers of both the States of New York and New Jersey. There is no dispute that at the time of the occurrence, this defendant had a number of police officers along with Port Authority detectives and superior officers on duty at John F. Kennedy International Airport, performing their various police functions.

■ Plaintiff Bizien's claim is premised solely on an alleged duty owed by the Port Authority to the general public to provide police protection at the airport. It is well settled in New York, however, that a governmental entity has no duty to provide police protection to any particular citizen, absent a special relationship between the entity and the plaintiff.

In *Weiner v. Metropolitan Transportation Authority*, 55 N.Y.2d 175, 448 N.Y. S.2d 141, 433 N.E.2d 124 (1982), plaintiff claimed that the New York City Transit Authority was engaged in a "proprietary function" while operating the New York City Transit System and, accordingly, owed her a duty to provide police protection from foreseeable criminal acts. Plaintiff claimed that prior violence at a subway station where plaintiff was assaulted imposed a duty on the Transit Authority to provide appropriate police protection to prevent such acts from recurring. Accordingly, plaintiff claimed that liability should be imposed against the Transit Authority in the same manner that liability would be imposed on a non-governmental common carrier.

The Court, in reversing the Appellate Division, dismissed plaintiff's complaint against the Authority:

> The activities for which it is sought to hold the authority in the cases under consideration involve or grow directly out of the failure to allocate police resources—the absence of police surveillance at the entrance and the failure to warn of criminal activity in the area or close the entrance when police protection was not available. That the police and the common carrier activity (otherwise proprietary) are vested in the same entity will not lessen the crushing nature of the burden that would otherwise be imposed (*Steitz v. City of Beacon*, 295 N.Y. 51, 55, 64 N.E.2d 704) nor interfere less with the legislative-executive decision how to utilize such resources (*see Riss v. City of New York*, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, *supra*). Nor should the fact that the other carriers may have employees designated as policemen change the responsibility of the authority, for the allocation of such a carrier's police resources involves no interference by the judiciary with the legislative-executive decision made by the authority (*see Motyka v. City of Amsterdam*, 15 N.Y.2d 134, 138, 256 N.Y.S.2d 595, 204 N.E.2d 635; *cf. Woodhull v. Mayor*, 150 N.Y. 450, 44 N.E. 1038, *supra; Biniewski v. City of New York*, 267 App.Div. 108, 44 N.Y.S.2d 543, *supra*).

*Weiner, supra,* 55 N.Y.2d at 181, 448 N.Y. S.2d at 144, 433 N.E.2d at 127.

The *Weiner* decision is only one in a long line of New York cases holding that a governmental agency owes no general duty to provide police protection to individuals. Only this year the Court added another case to the line. *See O'Connor v. City of New York*, 58 N.Y.2d 184, 460 N.Y.S.2d 485, 447 N.E.2d 33 (1983).

Perhaps more directly in point is *Bass v. City of New York*, 38 A.D.2d 407, 330 N.Y.S.2d 569 (2d Dep't 1972), *aff'd without opinion*, 32 N.Y.2d 894, 346 N.Y.S.2d 814, 300 N.E.2d 154 (1973) where the New York City Housing Authority was held to have no duty to provide police protection to a tenant of a housing project even though the Housing Authority acted as proprietor in an activity normally conducted by private enterprise. In *Bass*, a nine-year-old girl was raped and murdered on the roof of a housing project in the City of New York. At the time of the incident, the one Housing Police Officer assigned to the project was on his lunch break. There had been a history of violent incidents before the murder. Indeed, just a half-hour prior to the infant's murder a similar attack was attempted in the same building. Despite its compassion for the victim of the terrible incident, the Court held that:

> It is well settled that a municipality acting in its governmental capacity for the protection of the general public, cannot be cast in damages for mere failure to furnish adequate police protection to a particular individual to whom no special duty is owed. It seems clear to us that, under the circumstances at bar, the appellant's maintenance of a police force, although primarily limited to the housing project, was such as to bring that governmental function within the purview of this rule and that, absent special circumstances creating a legal obligation to provide police protection to the decedent individually, there is no basis for imposing liability upon the appellant solely by reason of the decedent's status as a resident of the project.

*Id.* 38 A.D.2d at 413–14, 330 N.Y.S.2d at 576 (citations omitted).

The conclusion is inescapable that the Port Authority, which maintains a police force in its governmental capacity, cannot be cast in damages for its alleged failure to provide adequate police protection to the general public. Accordingly, plaintiff Bizien's claim against the Port Authority is dismissed.

## 2. DEFENDANT BRITISH AIRWAYS

Both plaintiffs allege that British Airways was negligent in allowing the demonstrators to congregate in the departure lounge of the terminal, in permitting them to assemble at the base of the north ramp, and in attempting to usher the group out of the terminal when it became disorderly. Negligence, of course, is the failure to exercise that degree of care which a reasonably prudent person would use in the conduct of his own affairs under the circumstances.

Central to the Court's determination whether British Airways acted reasonably in its handling of the demonstrators is a recognition of the right of individuals to assemble at the terminal. As already seen, although the terminal is private property, British Airways may not exclude persons from the open, public areas of the terminal. Moreover, the departure lounge is a public forum in which people may exercise their First Amendment rights "in consonance with peace and good order." *Hague v. C.I.O.*, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). It is against this backdrop that a determination whether British Airways acted reasonably must be made.

When Mr. Leonard J. Levy, British Airways' Senior Security Officer was told that demonstrators had entered the building, he called the Port Authority Police Department for help. Mr. Levy then cautioned his fellow security officers that demonstrators might already be in the terminal and later patrolled the departure lounge, where he anticipated the demonstrators might congregate. He decided against requesting extra guards from IBI because the IBI

1101

guards are not trained in crowd control procedures and methods.

■ By the time the police arrived at the terminal, British Airways had already identified a group of non-passengers seated in the lounge who were likely to be demonstrators. The group was seated in a public, unrestricted area of the lounge and was orderly. When the police arrived, Mr. Levy discussed with the officers the possibility of moving the group out of the terminal and all agreed to commission Lieutenant Brown to urge the apparent leader of the group to conduct the protest somewhere outside the terminal. Because the demonstrators had a right to remain in the departure lounge of the terminal so long as they were peaceful, no attempt was made to remove them.

Thereafter, British Airways conducted normal boarding operations at the terminal, all the while keeping the group under surveillance. It was in this setting that the ruckus occurred—suddenly, abruptly, and without warning.

Considering these circumstances, it is difficult to conclude that British Airways acted other than reasonably. Once demonstrators were thought to be in the terminal, the police were summoned. When the police arrived, British Airways offered the demonstrators a location outside of the terminal in which to express their views. During the time the demonstrators remained in the departure lounge they were orderly and, for that reason, could not be removed from the Terminal. When several protesters dashed up the north ramp, their movements were sudden and unexpected. Although bottles of a caustic liquid were thrown, these bottles had not been observed earlier. Once violence broke out, it was quickly contained, and all protesters were led out of the terminal.

British Airways acted reasonably in policing its departure lounge—a public place—and its conduct cannot be characterized as negligent.

■ A special point should be made with respect to plaintiff Goodstein. He, of course, is a Port Authority police officer. A police officer assumes the ordinary risks inherent in his employment. *Cf. Miller v. City of Albany*, 158 Misc. 720, 721, 287 N.Y.S. 889, 892 (Sup.Ct. Albany County 1935), *aff'd*, 247 A.D. 848, 286 N.Y.S. 326 (3d Dep't 1936) (fireman). Therefore, even if British Airways were negligent, because Evan Goodstein assumed the risks inherent in controlling a crowd at the terminal, he is precluded from recovering against British Airways.

### 3. DEFENDANT IBI

■ Plaintiffs' weakest case is against IBI. The fundamental flaw is plaintiffs' consistent confusion of two distinct notions: duty and foreseeability. Foreseeability may not be used to create a duty where none otherwise exists. *Pulka v. Edelman*, 40 N.Y.2d 781, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976). Thus, the possibility that IBI might have foreseen a riot at the British Airways Terminal did not create a duty upon IBI to control it unless IBI voluntarily assumed such a duty by contract or otherwise. I find that it did not.

The IBI personnel inside the terminal were under the supervision of the British Airways' security staff. IBI personnel were not responsible to perform security patrols or to undertake other general security measures. IBI was responsible only for manning the baggage and boarding pass checkpoints and the magnetometer. IBI personnel were under instructions not to engage in any physical confrontation with persons observed in unauthorized areas. Rather, they were to advise British Airways security, which would take further necessary measures. Understandably, therefore, at no time was any request made for assistance from IBI to cope with the protesters present at the terminal.

Plaintiff Goodstein's Exhibit 5 is a copy of the agreement between British Airways and IBI. The contract obligates IBI to provide guards "for the safe and proper protection of the PROTECTED PROPERTY," defined as the British Airways Terminal at Kennedy Airport. The purpose of

this proffered Exhibit is obscure, unless plaintiffs are alleging a cause of action as third-party beneficiaries of the contract, which they regard as having been breached.

The right of a third-party beneficiary to sue on a contract has long been recognized in New York. *See Lawrence v. Fox*, 20 N.Y. 268 (1859); *Seaver v. Ransom*, 224 N.Y. 233, 120 N.E. 639 (1918). Under New York law, however, a third-party may recover only where the contracting parties intend to confer a benefit upon him. Conversely, when a third-party is only incidently benefitted by a contract, he may not sue on the contract. *Compagnie Nationale Air France v. Port of New York Authority*, 427 F.2d 951, 954 (2d Cir.1970). *See New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc.*, 561 F.Supp. 954, 979 (W.D.N.Y.1983); *Westhampton House, Inc. v. Carey*, 506 F.Supp. 215 (N.Y.1980); *Kornblut v. Chevron Oil Co.*, 62 A.D.2d 831, 407 N.Y.S.2d 498 (2d Dep't 1978), *aff'd* 48 N.Y.2d 853, 424 N.Y.S.2d 429, 400 N.E.2d 368 (1979).

In personal injury cases, an injured party may not recover as a third-party beneficiary for failure to perform a duty imposed by a contract unless it is apparent from the language of the agreement that the contracting parties intended to confer a direct benefit upon the plaintiff to protect him from physical injury. *See Cerullo v. Aetna Casualty & Surety Co.*, 41 A.D.2d 1, 4, 341 N.Y.S.2d 767, 770 (4th Dep't 1973). Thus, in *Bernal v. Pinkerton's, Inc.*, 52 A.D.2d 760, 382 N.Y.S.2d 769, 770, *aff'd without opinion* 41 N.Y.2d 938, 394 N.Y.S.2d 638, 363 N.E.2d 362 (1976), a case directly on point, the telephone company had hired Pinkerton to guard one of its facilities. A telephone company employee was shot by an intruder who had gained access to the facility through an unguarded gate. Holding that the plaintiff employee had no contract claim against Pinkerton, the Appellate Division found that the employee was, at best, an incidental beneficiary.

Analysis of the contract between British Airways and IBI reveals no intent to provide protection for the plaintiffs. It is expressly stated in the agreement that the IBI guards were hired merely to protect the premises and property owned or leased by the airline. Further, an examination of plaintiffs' Exhibit 5 discloses no provisions indicating that third parties may bring an action under the agreement. Any incidental benefits that may inure to the plaintiffs may not reasonably be viewed as "primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly [to the plaintiff] if the benefit is lost." *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 164, 159 N.E. 896, 897 (1928).

Under the circumstances, I find that plaintiffs are not third-party beneficiaries and therefore may not recover on a contract theory.

For the foregoing reasons, judgment will be entered for defendants as to each of the plaintiffs' claims.[2] These constitute my Findings of Fact and Conclusions of Law for purposes of Fed.R.Civ.P. 52.

SO ORDERED.

---

**2.** The failure of Evan Goodstein to recover on his negligence claims forecloses his wife, Lorraine Goodstein, from recovering on her claim for loss of consortion.