Robert V. Santangelo, J.
Felice De Koven, individually and on behalf of 32 other tenants of the premises 780 West End Avenue, Manhattan, brought suit against the landlord, 780 West End Realty Co., and the mortgagee, Kings County Savings Bank, pursuant to article 7-A of the Real Property Actions and Proceedings Law.
The landlord, 780 West End Realty Co., instituted summary proceedings for nonpayment of rent against the following 24 tenants of said premises:
Gertrude Klein ....................Index No. 87088
Francis Lubin.....................Index No. 87076
William Berkowitz.................Index No. 87077
Allan Pospisil.....................Index No. 87078
Gretel Tannhauser.................Index No. 87079
Robert Bernstein ................ .Index No. 87080
Naomi Weiss......................Index No. 87081
Alice Adamczyk....................Index No. 87082
Mortimer Goldberg.................Index No. 87083
Leo Rostal ........................Index No. 87084
Martha Jacks......................Index No. 87085
Sol Gidseg.........................Index No. 87086
Audrey Hemenway.................Index No. 87087
Alexander Lory....................Index No. 87089
Fannie Landsman and Hyman Gelfand .........................Index No. 87075
Joseph Morgens ...................Index No. 87074
Nathan Grossner...................Index No. 87073
Saul Krupp .......................Index No. 87072
Charles DeKoven..................Index No. 87071
Max Fortgang.....................Index No. 87070
John S. Blumberg..................Index No. 87069
Charlotte Schwartz.................Index No. 87068
Georgiana Donnelly and Frances Ileeran .........................Index No. 87065
Rose Brown.......................Index No. 87067
A stipulation was entered into between the parties wherein the tenants consented to judgment in favor of the landlord in all the nonpayment proceedings, the attorney for the tenants to *953 hold the rent in escrow, with a promise on the part of the landlord not to execute on those judgments until the final determination of the article 7-A proceeding. If the court decided in favor of the landlord in the article 7-A proceeding, then the escrow money would be turned over to the landlord’s attorney; if resolved in favor of the tenants, then the money would be used pursuant to the court’s direction.
The proceeding brought by 33 of 61 tenants residing at 780 West End Avenue in the Borough of Manhattan pursuant to the recently enacted article 7-A of the Real Property Actions and Proceedings Law, prays for an order directing the deposit of rents into court for the purpose of remedying alleged conditions dangerous to life, health or safety.
Section 770 provides that “ One-third or more of the tenants occupying a multiple dwelling located in the city of New York may maintain a special proceeding as provided in this article, upon the ground that there exists in such multiple dwellings or in any part thereof a lack of heat or of running water or of light or of electricity or of adequate sewage disposal facilities, or any other condition dangerous to life, health or safety, which has existed for five days, or an infestation by rodents, or any combination of such conditions.”
Petitioners specify that assaults, robberies and burglaries were committed in the building, 780 West End Avenue, as a proximate result of the respondent landlord’s failure to provide adequate protection for the residents of the multiple dwelling. More particularly, petitioners claim that the landlord’s failure to provide round-the-clock doorman service seven days a week constitutes a proximate and continuing danger to the life, health and safety of the tenants.
The court finds from the evidence presented:
1. There were sufficient incidents of crime to instill fear in the minds of these tenants, causing an unsafe feeling as to their persons and property.
2. During the past year assaults upon tenants, burglaries and larcenies have increased.
3. Police protection in the area was and still is inadequate, adding to the insecurity of the tenants. Accordingly, the court has no hesitancy in suggesting that the additional services of a doorman would lessen the number of crimes occurring within and around the building.
The question which this court must face, however, is whether section 770 of the Real Property Actions and Proceedings Law, which gives one third or more of the tenants of a multiple dwell *954 ing the right to bring the proceeding if a “ condition dangerous to life, health or safety” exists, includes absence of a doorman as a “ condition dangerous to life, health or safety ’ ’.
The court is of the opinion that incidents of crime, perpetrated by third parties within the premises, impose no obligation upon the landlord to provide doorman service, especially where there has been no contractual obligation or obligation imposed by statute to provide the same.
Criminal activity in the area of a multiple dwelling or within the premises itself was never contemplated by the Legislature under the provisions of article 7-A.
An examination of the legislative findings and intent reveals that the primary reason for which article 7-A was enacted was to provide additional remedies for enforcement of existing rights. Article 7-A is part of the Real Property Actions and Proceedings Law, a procedural statute, not a substantive act ■such as the Multiple Dwelling Law, and as such it neither created new substantive rights on behalf of tenants nor imposed additional obligations upon a landlord.
The intent of the Legislature is further clarified by examining the enumerated conditions which article 7-A prescribes as dangerous to life, health or safety: they are lack of heat, running water or of light or of electricity or of adequate sewage disposal facilities or an infestation by rodents. Each of these enumerated conditions is the responsibility of a landlord under the Multiple Dwelling Law and each is the proximate cause of injury to the tenants. The lack of doorman service is neither. No obligation to provide such services is prescribed by the Multiple Dwelling Law or any regulation of the Rent Commission. Moreover, failure to provide such service is not the proximate cause of injury to tenants in the case of a crime perpetrated upon them by the intervening act of a person not in the employ of or agent of the landlord.
The question whether doormen should be furnished is a grave matter for the Legislature. Indeed, the last Legislature passed laws to protect tenants from the high rise in the crime rate.
Section 35 of the Multiple Dwelling Law was amended to require owners of multiple dwellings to install lights on both sides of the front entranceway of the building and to have them lit from sunset to sunrise. (L. 1965, ch. 496.) Section 51-a of the Multiple Dwelling Law was enacted to provide for peepholes to be placed by the owner of a multiple dwelling in the door of every housing unit. (L. 1965, ch. 493.)
*955 However, the Legislature failed to pass any law which in effect commanded or directed owners of multiple dwellings to provide doorman service.
This court cannot, under the present state of the law, direct the employment of doormen by owners of this multiple dwelling, now without such service.
Petitioners also specify the following conditions, alleged to be dangerous to the life, health and safety of the tenants:
‘ ‘ a) The public areas contain dirty halls, eroded and cracking walls and ceilings, a defective outer door, a defective elevator, a hole in the floor near the elevator, obsolete firehoses, inadequate garbage collection, vermin in the hallways and a window in the lobby is insecure and broken, all of which are a danger to the life and health of the tenants.
“ b) The apartments in the building contain roach infestation, defective outer doors, defective windows, cracked and peeling plaster, defective and leaking plumbing, rotting floors, cracked sinks, obsolete plumbing facilities, cracked tiling, defective stoves, defective radiators, defective electrical outlets, insufficient heat and a leaky skylight, all of which are a danger to the life, health and safety of the tenants.”
As a result of a petition to the Department of Buildings an emergency inspection of the premises was conducted. The inspector visited 90% of the apartments and submitted a report to his superior. As of the date of the institution of this action, the landlord had not been notified of the inspector’s findings.
The inspector reported 34 violations in 16 apartments as follows:
Number
Violation Found
Window cannot be readily opened....................... 9
Repair tile floor in bathroom........................... 4
Door not properly fitted............................... 4
Repair waste stopper in bathroom...................... 2
Concealed leak................ 2
Inadequate supply of cold or hot water.................. 2
Replace door saddle................................... 2
Replace glass in window............................... 2
Plaster walls or ceiling in apartment.................... 3
Repair flushing apparatus............................. 1
Plaster wall in public hall.............................. 1
Repair door frame.................................... 1
Repair hole in wood floor............................... 1
*956 From the testimony and from the court’s own observations, obtained on an inspection tour of the premises which is discussed below, the court is convinced that the afore-mentioned conditions, found by the inspector are not of such a magnitude, individually or collectively, as to constitute a danger to the life, health or safety of the tenants. Neither are the individual conditions sufficient to constitute a constructive eviction so as to bring the petitioners within the purview of relief afforded by section 755 of the Beal Property Actions and Proceedings Law.
The court visited the premises with the consent of the parties on November 11. The tenants’ committee and the tenants’ attorney were present during the inspection along with a representative of the landlord. A newspaper reporter, a photographer and Congressman William Byan were also in attendance. The court observed the public areas of the premises and also visited various apartments. There were plumbers on the premises attending to repairs of waste stoppage and flushing apparatus. Carpenters and painters were working to correct divers conditions throughout the building.
The public areas did not contain dirty halls, eroded and cracked walls and ceilings or vermin. The outer door and the elevator, alleged to be defective, were in proper working condition. The elevator had been certified as safe by the Department of Buildings on October 20, 1965.
The court upon inspection of various apartments found the windows in working order. There was no evidence of roach infestation apparent to the court nor was any such condition pointed out. The violations as to inadequate cold and hot water had been corrected.
At the trial there was testimony that the skylight in Penthouse B was in such a defective condition as to permit rain to leak into the living room of that apartment. The court inspected the skylight and found it to be in such a defective state and so informed the landlord. The continued existence of such a condition is a nuisance and a danger to the health of the tenants occupying these premises.
From the testimony at the trial and the court’s own inspection of the premises the court is satisfied that the remaining defective conditions were not basically dangerous. There was no evidence offered that the self-service elevators used by the tenants were not in good running order, or were in anyway dangerous to the life, safety or health of the tenants in their maintenance and operation.
*957 The court was satisfied that the premises were adequately wired and approved by the Department of Water Supply, Gas and Electricity. No satisfactory convincing evidence was furnished that there was any dangerous condition from the electrical system installed in 1962. As a matter of record, the tenants admitted that upon the installation of adequate wiring in the entire premises, and in each apartment, the Bent Commission upon certification of the Department of Water Supply, Gas and Electricity granted the landlord an increased rental.
The court was also satisfied that the heating service was adequate, with the exception of a few radiators which needed new valves or the repairs thereof. There was no evidence that there was any water shortage or inadequate supply of water which would be dangerous to life, health and safety.
It appeared from the evidence that the landlord painted the apartments of the complaining tenants practically every three years. In the main, the list of complaints in the tenants’ petition which were recited as dangerous to health, life or safety fell short of being proved >by a fair preponderance of the credible evidence. Those defects which do exist are of a minor nature. They are not conditions dangerous to the health, safety or life of the tenants in this multiple dwelling.
The petition alleges roach infestation. There was evidence that roaches were found in one apartment. The evidence also indicated that the landlord supplied exterminator services at regular monthly intervals. The inspector testified that he found no infestation of roaches at the time of his inspection.
In the light of this court’s findings, each and every tenant is legally in default in his refusal to pay the monthly rental due and owing to, and demanded by, the landlord, for the months of August, September and October. Judgment in favor of the landlord is awarded in all the nonpayment proceedings except No. 87083. In that proceeding, because of the existence of a nuisance, as found by this court, the nonpayment proceeding is stayed until the nuisance is abated.
Accordingly, the attorney for the tenants is directed to pay over to landlord within five days after the date of this decision all moneys held by him pursuant to the stipulation, excepting that representing rent due from the tenant in Penthouse B, Mortimer Goldberg, and as to that he is directed to pay over the money to the Clerk of this court within live days after the date of this decision.