OPINION OF THE COURT
Paul G. Feinman, J.
Following a jury trial in this personal injury action, plaintiff was awarded damages for past and future pain and suffering and past and future medical expenses. Defendant City of New York has moved pursuant to CPLR 4404 (a) for an order setting aside the jury verdict on the ground that plaintiff failed to establish a prima facie case, and entering judgment in favor of the City as a matter of law. Alternatively, the City seeks to set aside the future medical expenses portion of the verdict on the ground that the award was against the weight of the evidence.[1]
After the jury rendered its verdict, plaintiffs counsel moved on the record to have the court set aside the jury’s finding of allocation of fault as between the defendant and plaintiff. She also moved for additur. The court denied plaintiffs motion on the record at the time of the verdict, and she now cross-moves for leave to reargue both branches of her oral post-trial motion. Alternatively, plaintiff seeks an order granting a new trial on liability and damages.
By interim decision and order dated March 8, 2011, this court directed the parties to provide the entire trial transcript, and held the motion and cross motion in abeyance. The transcripts have now been provided. After review of the papers and transcripts in their entirety, the City’s motion to set aside the jury verdict on the ground that plaintiff failed to establish a prima facie case, and enter judgment in favor of the City as a matter of law, is granted. The alternative branch of its motion is denied as academic. Plaintiffs cross motion is denied in its entirety.
*370 The Trial Testimony
Plaintiff was badly injured on November 5, 2005, when she rode her bicycle into a large pothole while biking under an overpass on the eastbound 65th Street transverse which cuts through Central Park. She and her then-boyfriend Brian Hoberman had been given permission to use the transverse by an individual who was later determined to be a New York City Department of Transportation (DOT) employee who was setting up a barricade to block vehicular traffic on that roadway prior to repairing the road. The verified complaint alleges that defendant City owns and maintains the transverse and was under a duty to keep it safe and in good condition, and although it had received prior written notice of the street’s dangerous condition, it had failed to timely remedy the defect (document 2, verified complaint lili 2-12).[2]
Plaintiff testified that on the morning of November 5, 2005, the day before the annual New York City Marathon, she and Hoberman were riding their bikes to join others for a bike ride commencing on the east side of Manhattan (document 42, trial tr, Wittorf testimony at 770). Along Central Park West were blue police barricades set up for the marathon, and the 96th Street entrance to the park was closed for the marathon (Wittorf testimony at 772). They then rode down to the 65th Street transverse where “guys were putting up cones.” (Id.) Plaintiff had never crossed the 65th Street transverse on her bike because of the heavy traffic (Wittorf testimony at 829). On his bike, Hoberman approached the worker “with the cones and asked him if we could go through, and he said sure, go ahead.” (Id.) It was her understanding that “it was okay to go,” and that there “was no reason to think there was anything wrong.” (Wittorf testimony at 773.) The two proceeded to ride on the transverse, Hoberman in front of plaintiff and to her right, and there were no warning signs or anything to suggest any danger (Wittorf testimony at 773-774). There were no workers or trucks or equipment in the view ahead of her (Wittorf testimony at 774). She was traveling in the eastbound lane (Wittorf testimony at 775). At the area of the second overpass, the sun was in her eyes, but she was able to see a big hole in the pavement ahead of her, and she moved to the left, and then rode into a bigger hole, where she suffered injury (Wittorf testimony at 774-775).
*371 Hoberman testified that as they rode down Central Park West, he saw “a worker putting out cones who looked like he was in the process of closing the roadway,” and thought it “would be a good opportunity to go through the transverse without vehicles . . . to get to the east side” (document 40, trial tr, Hoberman testimony at 519). He had never ridden his bike on the transverse before (document 40, Hoberman testimony at 518). He rode toward the worker and asked if it was okay if they rode through (document 40, Hoberman testimony at 521). The worker said “it’s okay to go through.” (Document 40, Hoberman testimony at 522). The worker said nothing else (document 42, Hoberman testimony at 734-735). Hoberman understood that this meant it was safe for them to ride through, and he assumed that the road closing was based on preparations for the marathon (document 40, Hoberman testimony at 522-523; document 42, Hoberman testimony at 753). He rode his bike in about the center of the eastbound lane (document 40, Hoberman testimony at 529, 531). As he rode under the first overpass he saw nothing unusual on the roadway, and saw no vehicles traveling ahead of him or on the other side of the roadway traveling west (document 40, Hoberman testimony at 525-527). The second overpass was “a good distance away from the first,” and was “maybe two thirds of the way through the park” (document 40, Hoberman testimony at 524). As he neared the second overpass, the roadway appeared fine (document 40, Hoberman testimony at 528). He could only see the light on the other end of the tunnel and could not see the roadway surface underneath the tunnel, because of the contrast between the sun outside and the darkness of the tunnel itself (document 40, Hoberman testimony at 529-530). He rode through the tunnel without incident, and saw nothing to concern him (document 40, Hoberman testimony at 530). However, after he had ridden through, a jogger in the opposite direction yelled out that Wittorf behind him had crashed (document 40, Hoberman testimony at 531). He then rode back; he observed that the area of road where plaintiff crashed was located “towards the center of the roadway, near the yellow line,” had two very large and deep holes, one a bit closer to the right center of the road, and the one into which she crashed located in the center of the roadway (document 40, Hoberman testimony at 532). He saw initially the jogger and maybe one worker helping plaintiff, and later three or four workers also came over, and someone called 911 (document 40, Hoberman testimony at 533; document 42, Hoberman testimony *372 at 739-740, 750-751). After this accident he saw a City vehicle approaching from the east, driving west (document 40, Hoberman testimony at 525-526). He did not see any construction equipment or pile of hot asphalt (document 42, Hoberman testimony at 740).
Parts of the pretrial deposition testimony taken on October 26, 2007, of DOT crew supervisor Donald Bowles, were read at trial (document 40, trial tr, Bowles examination before trial [EBT] at 447-460; document 41, trial tr, Bowles EBT at 680-717). According to Bowles’ testimony, he supervised the milling and resurfacing work of streets in New York County and sometimes supervised pothole crews (document 40, Bowles EBT at 450). On November 5, 2005, he and his crew had been sent to “do a special condition that was reported on the 65th Street Transverse,” a street that supports two-way traffic (document 40, Bowles EBT at 451, 459). A “special condition” is a project involving a defect “bigger than a pothole” but less involved than road resurfacing (document 40, Bowles EBT at 452). The report indicated the condition was in the eastbound lane, but according to Bowles, there was nothing wrong with the eastbound lane, and the work they did on that day was in the westbound lane (document 40, Bowles EBT at 454). Ultimately, the work done that day encompassed 16.4 square yards of repair in one continuous area (document 41, Bowles EBT at 693-694, 696). Bowles conceded that in fixing the condition, the workers may have opened some of the street on the eastbound side, but stated that the existing condition was entirely within the westbound lane (document 41, Bowles EBT at 711).
The workday began at 7:00 a.m. (document 41, Bowles EBT at 682). He and some of his crew drove onto the transverse, entering on the east side at Fifth Avenue, to find the condition at issue (document 41, Bowles EBT at 684). When they entered, they closed off the westbound lane to traffic with cones (document 41, Bowles EBT at 685). They drove until they found the condition under the overpass; when they saw the condition, Bowles and one of his crew then drove in their safety truck to the west side of the transverse to close the street (document 41, Bowles EBT at 685). Based on seeing the condition of the road, Bowles determined what equipment would be needed to do the work, namely a pickup truck, a debris truck, and probably a small dump truck with a “hot box” to keep asphalt hot (document 41, Bowles EBT at 683-684).
Upon reaching the west side of the 65th Street transverse, he and his crew member found a police barricade to close off the *373 eastbound entrance, thus in effect closing the street to vehicular traffic in both directions (document 41, Bowles EBT at 686, 700). As Bowles and the other worker were setting up the barricade, two bicyclists approached and asked if they could still go through (document 41, Bowles EBT at 698, 699). “I said sure,” Bowles testified, because the workers had not yet completed setting up (document 41, Bowles EBT at 698).[3] Neither Bowles nor the other DOT worker observed the bicyclists ride away as they were “busy setting” up the street closure (document 41, Bowles EBT at 700).
After they finished setting up the barricade, Bowles and the other worker drove back to the job site, where they came upon the accident (document 41, Bowles EBT at 687). One of the crew members was in the actual vicinity when the accident occurred, and the rest of the crew was in the area (document 41, Bowles EBT at 688-689). The work trucks were located further east of the overpass and accident site (document 41, Bowles EBT at 690-691).
Pursuant to the verdict sheet, the jury found the following: the roadway on which plaintiffs accident occurred was not in a reasonably safe condition, but the City had neither caused or created the condition nor received timely written notice of the condition; the DOT employee Bowles was 60% negligent in permitting plaintiff to enter the transverse and his negligence was a substantial factor in causing her injuries, and plaintiff was 40% negligent and her negligence was a substantial factor in causing her own injuries (documents 23-1, 27-1, verdict sheet lili 1-6). The jury awarded plaintiff $1.5 million for past pain and suffering and $1 million future pain and suffering, and awarded her $243,000 in past medical expenses and $608,000 in future medical expenses (id. 1N 7-8).
Defendant’s Motion to Set Aside the Verdict
The standard for setting aside a jury verdict on the basis that its findings were not supported by legally sufficient evidence as a matter of law (CPLR 4404 [a]) is a determination that “ ‘there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial.’ ” (Sow v Arias, 21 AD3d 317, 317 [1st Dept 2005], quot *374 ing Cohen v Hallmark Cards, 45 NY2d 493, 499 [1978]; see Nicastro v Park, 113 AD2d 129, 132 [2d Dept 1985].)
Defendant City argues that it was improper to ask the jury whether the City was negligent as concerns the actions of its DOT employee, Donald Bowles, when he permitted plaintiff and her boyfriend to enter Central Park on their bicycles at the 65th Street transverse. It argues that the DOT employee, who was closing off the street to vehicular traffic, was acting in his discretionary governmental capacity to control traffic, for which the City is immune from a finding of negligence. In addition, the City argues that even if it is determined that traffic regulation in this matter was ministerial in nature rather than discretionary, plaintiff has not alleged and did not prove that the City owed her a special duty of care such as would cause the City to be liable for plaintiffs damages. In sum, it argues that there is no claim on which plaintiff can recover damages against the City based on the conduct of the DOT employee, and the verdict must be set aside and entered in favor of defendant.
Plaintiff argues in opposition that the jury was properly asked about the DOT employee’s actions, and its finding that his negligence in waving the. two bicyclists through the closed street, an action which occurred during his work as part of the DOT crew sent out to repair the street, properly subjects the City to liability, as street repair work by a governmental agency is proprietary in nature.
“Our cases on governmental tort liability have long distinguished between discretionary and ministerial acts of government officials” (McLean v City of New York, 12 NY3d 194, 202 [2009]). “ ‘[W]hen official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice.’ ” (McLean at 202, quoting Tango v Tulevech, 61 NY2d 34, 40 [1983].) As to negligent ministerial acts, they will not be otherwise tortious unless the plaintiff can show “a duty running directly to the injured person,” and that the duty breached is “more than that owed the public generally.” (McLean at 202, quoting Lauer v City of New York, 95 NY2d 95, 99-100 [2000].) Thus, the rule is that government action, if discretionary, is never a basis for liability, and ministerial action may be only if it violates a special duty owed to the plaintiff, apart from any duty to the public in general (.McLean at 202-203).
Defendant argues that DOT’s Bowles was engaged in the discretionary function of traffic control at the time plaintiff and *375 Hoberman approached him at the 65th Street transverse. He exercised governmental discretion when he decided to close the 65th Street transverse to vehicular traffic in both directions in order to complete the street repairs. Bowles could have decided to close only the westbound lane, given that the damage was localized under one overpass on the westbound side, but used his discretion to close both lanes. Similarly, he used his discretion, based on the crew not being set up to work, in permitting plaintiff and her boyfriend to ride through. These decisions, argues the City, pertained to traffic control, a discretionary function. Thus, the City argues that any negligence in failing to warn plaintiff and Hoberman of the street condition under the overpass cannot be a basis for liability.
In support of its position, the City cites several cases examining municipal liability for decisions by police officers concerning traffic management which lead to injury, all of which hold that the officers were engaged in discretionary governmental activity that is immune from a finding of liability. In Kovit v Estate of Hallums (4 NY3d 499 [2005]), consolidating two actions, the municipality was not held liable when its police officer instructed a distraught driver to move her hazardously positioned vehicle forward, and the driver went in reverse and injured a pedestrian behind her {Kovit), nor when a police officer directed a driver to move his car off the road side, and the driver who was ill, lost control of his vehicle and crashed, suffering injury {Lazan v County of Suffolk).
In Balsam v Delma Eng’g Corp. (90 NY2d 966 [1997]), the City of New York was not held liable for the police response to a street’s ice hazard where the plaintiff, who suffered a motor vehicle accident, was then injured in a secondary motor vehicle accident caused by the same icy roadway; on appeal the plaintiff argued that the police breached their proprietary duty to keep the street safe by closing the roadway, redirecting traffic, or placing warning cones near the icy condition, but the Court held that traffic regulation is a “classic example” of a governmental function undertaken for the protection and safety of the public pursuant to the general police powers, and the City was thus immune from liability for its officers’ actions. {See also Devivo v Adeyemo, 70 AD3d 587 [1st Dept 2010] [no municipal liability where police officers’ discretionary acts in configuring barricade at a public event allegedly caused injury to the plaintiff]; Shands v Escalona, 44 AD3d 524 [1st Dept 2007], lv denied 10 NY3d 705 [2008] [no municipal liability where officer *376 guided plaintiffs vehicle back onto a highway to avoid flooding at the exit, after which the plaintiffs vehicle was struck by a tractor-trailer]; Gonzalez v County of Suffolk, 228 AD2d 411 [2d Dept 1996] [no municipal liability where plaintiff stepped on lit road flare after leaving fireworks display; placement of road flares to direct traffic is governmental function].) In sum, the City argues that the act of managing pedestrian and vehicular traffic in the furtherance of public safety is always a discretionary governmental action and, therefore, “when official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice” (Tango v Tulevich, 61 NY2d at 40). Alternatively, the City argues that in this situation, if managing traffic is held to be a ministerial action, then plaintiff failed to establish her claim in that she did not show that the City owed her a special duty, above and beyond that owed by the City to the general public (McLean at 202).
Plaintiff argues that Bowles, employed by the Department of Transportation, is not a police officer but employed to do street repair work, an activity which has been held to be proprietary rather than governmental in nature. Thus, she argues, the City as his employer is subject to the same duty of care as any ordinary person or contractor.
A municipality or governmental agency is engaged in proprietary activity when it performs an activity traditionally engaged in by the private sector {see Bass v City of New York, 38 AD2d 407, 411 [2d Dept 1972], affd 32 NY2d 894 [1973]). One characteristic of a proprietary duty is that the governmental workers are charged with the responsibility to physically maintain the property at issue {Balsam v Delma Eng’g Corp., 90 NY2d at 968). When a municipality or the State acts in a proprietary capacity, the municipality or the State will be subject to the same principles of tort law as a private entity {see Miller v State of New York, 62 NY2d 506, 511 [1984] [State acting as landlord of college dormitory]). Examples of proprietary functions cited by plaintiff include maintenance and repair of water mains {D & D of Delhi, Inc. v Village of Delhi, 47 AD3d 1117, 1118 [3d Dept 2008]), snow removal from steps of State-owned building {McGowan v State of New York, 41 AD3d 670, 671 [2d Dept 2007]), and operating a public park {Vestal v County of Suffolk, 7 AD3d 613 [2d Dept 2004]). (Document 31, plaintiff aff in opposition It 8.)
Plaintiff argues that acts and omissions relative to highway and street maintenance are deemed proprietary when performed *377 by highway or maintenance personnel (document 31, plaintiff aff in opposition 1i 10, et seq., citing Missano v Mayor of City of N.Y., 160 NY 123, 129 [1899]). Missano holds that as to repairs and cleanliness of streets, the municipality acts as a “legal individual,” rather than in its governmental function. Plaintiff also cites Storrs v City of Utica (17 NY 104 [1858]), which holds that a municipality is under a duty, during the time it is excavating a street for a public improvement, to take measures to warn travelers of the danger. She points to various more recent decisions holding municipalities or governmental authorities negligent when nonpolice governmental employees failed to take appropriate safety measures at municipal road sites. For instance, in Grant v Ore (284 AD2d 302, 303 [2d Dept 2001]), where the City of New York was performing maintenance work on a bridge and provided only an illuminated arrow board directing traffic to merge but no warning signs concerning the maintenance work, it was held partially liable for the plaintiff’s resulting motor vehicle injuries because of its nondelegable duty to maintain its roads in a safe condition. In Humphrey v State of New York (90 AD2d 901 [3d Dept 1982], affd 60 NY2d 742 [1983]), the State was held 60% liable for its negligence in not giving adequate, unambiguous warnings of conditions on the highway on which the decedent crashed. In Majka v Haskell (301 NY 206 [1950]), although the municipality was found to have discharged its duty by closing to pedestrians an area of damaged sidewalk on a viaduct, it failed in its duty to post warnings to pedestrians at the entrances to the viaduct about the condition, resulting in the plaintiff entering and crossing the viaduct on foot and stepping into traffic at the damaged area where he was struck by a vehicle.
In Ramos v Triborough Bridge & Tunnel Auth. (179 AD2d 471 [1st Dept 1992]), also cited by plaintiff, the Bridge and Tunnel Authority (TBTA) and its employee, a tow truck driver, were sued on the theory that the employee was negligent when he stopped his truck on a bridge lane to aid a disabled vehicle but did not illuminate his truck’s directional arrow and did not know to set out cones behind the truck, resulting in the plaintiffs vehicle colliding with the truck. The jury found the TBTA 65% negligent for plaintiff’s injuries. On appeal, the Court held the evidence demonstrated that the tow truck operator was negligent and declined to find, as urged by the TBTA, that the professional judgment standard of the TBTA’s employee was the equivalent to the standard that a firefighter was *378 held to in Kenavan v City of New York (70 NY2d 558 [1987]). In Kenavan, a firefighter was killed and three others injured when, in the course of containing a car fire, they were struck by a civilian driver who failed to see them at work; the firefighters sued the City in part on the ground that one of the firefighters was negligent in failing to properly park the fire truck, and another failed to establish “fire lines” to protect the crew from oncoming traffic. Kenavan held that municipal liability will not be imposed where a firefighter exercises professional judgment and elects one among many acceptable methods of carrying out tasks, even if the decision was faulty, as these are “matters of judgment within the ambit of ordinary negligence for which no cause of action against a municipality will lie” (70 NY2d at 569-570). The Ramos Court, in distinguishing the facts before it from those in Kenavan, noted that the tow truck operator did not elect an acceptable procedure under the circumstances, unlike the Kenavan firefighters. In addition, Ramos stated that a firefighter and the TBTA’s tow truck operator “clearly face different levels of risk in their jobs and are thus reasonably held to different standards in carrying out their jobs” (179 AD2d at 472-473).
Plaintiff argues that case law shows that when the underlying municipal function at issue is maintenance or repair of streets and roadways, then the municipality is held to the same standard of care as any person, and when the safety of the street is at issue based on the decision or action of a police officer or firefighter, the municipality is immune from a finding of negligence where no warning was issued (document 31, plaintiff aff in opposition 1ÍH 15-170). Plaintiff contends that because the underlying function at issue here is street repair, the City must be held liable for Bowles’ failure to warn, and the question posed to the jury was entirely proper.
Defendant argues that plaintiff’s arguments do not take cognizance of the nuance in the law, as expressed by the Court of Appeals, that it is
“the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs li- ■ ability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred” (Miller v State of New York, 62 NY2d 506, 513 [1984] [internal *379 quotation marks and citation omitted; emphasis added]).
The law paints with a finer brush by focusing on the act and the capacity of the actor, rather than merely on the actor’s employer, to determine if the action is immune from suit. Miller describes a governmental entity’s continuum of responsibility to individuals and society ranging from the purely proprietary, such as “repair of steps . . . in an apartment building,” to more complex measures of safety and security for a greater area and populace, until at a certain point only governmental functions are involved, as in “the maintenance of general police and fire protection” (62 NY2d at 512). Miller notes that “any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the State’s alleged negligent action falls into, either a proprietary or governmental category.” (Id.)[4]
Here, plaintiffs claim against the City is that Bowles, a DOT employee on the job to repair the transverse potholes, negligently allowed her entrance to cross the 65th Street transverse without warning her of the defect in the road ahead. Under this theory of liability, it is not the existence of the potholes or how they were created, nor whether the City had prior written notice of their existence for which she seeks to hold defendant liable, both of which were considered by the jury and rejected as bases of liability, and not the act of repairing the street, but rather his failure to warn. Bowles’ inaction occurred while he and a crew member were carrying out his decision to close the transverse to vehicular traffic. He was not engaged in actual repair of the street, nor had his crew set up or started work at the site. Bowles, a DOT supervisor, clearly had the authority to manage street traffic for the safety of the driving public. Under Miller, the issue is not what municipal agency employs Bowles, but his inaction while closing off the street, out of which plaintiff claims her injury to have arisen. The conclusion that must be reached here is that he was acting in a discretionary capacity at the time Hoberman and plaintiff sought permission to cross.
*380 None of the cases cited by plaintiff finding municipal negligence based on actions of its nonpolice employees are persuasive here. For instance, in Grant v Ore (284 AD2d 302 [2001], supra), the City was found to have failed in its nondelegable duty to maintain its roads in a safe condition when its workers, engaged in bridge repairs, did not put up signs warning of work ahead, although they did post an illuminated arrow board directing traffic to merge left. In contrast, here it is the decisions by Bowles to close off the street and then to allow plaintiff and her boyfriend through the transverse on their bicycles that is at issue, not whether there were signs posted and work underway. Similarly, in Humphrey v State of New York (90 AD2d 901 [1982], supra), the State was held partly liable for not posting adequate warning signs of conditions on the highway. In Majka v Haskell (301 NY 206 [1950], supra), as well, the municipality failed in its duty to post warning signs to pedestrians at the entrances to a viaduct about a dangerous condition on the viaduct sidewalk. In Ramos v Triborough Bridge & Tunnel Auth. (179 AD2d 471 [1992], supra), relied on by plaintiff for its discussion of the defendant’s unpersuasive argument that its tow truck operator’s judgment should be held to the same professional standard as that of a firefighter, there is no analysis of governmental versus proprietary action. Rather liability was found based on the employee’s negligence.
Plaintiffs other arguments also lack persuasiveness. There is no allegation that Bowles made any representations concerning the safety of the roadway when he allowed plaintiff access to the transverse, and thus she cannot rely on Yau v New York City Tr. Auth. (10 AD3d 654 [2d Dept 2004], lv denied 4 NY3d 701 [2004]) or Ohlhausen v City of New York (73 AD3d 89, 93 [1st Dept 2010]). In Yau, the driver of a city bus was held liable because he waved to the plaintiff, a pedestrian, who relied on his signaling to her that it was safe to cross the street, to her detriment. Ohlausen explains the well-established rule in these pedestrian cases, a gesture waving a pedestrian to walk across a street will “only constitute a proximate cause of the accident where the pedestrian relied on the implicit assurance of safety,” but if the pedestrian understood the driver’s gesture to indicate only “that the driver would pause and allow him or her to pass, rather than as an assurance with regard to any other vehicles on the road, then the gesture cannot be said to have proximately caused the accident” (73 AD3d at 93-94). Here, plaintiff seeks to argue that Bowles’ affirmative answer granting permission to *381 the two bicyclists to go through the transverse is the equivalent of indicating that there was nothing at issue with the street ahead. The situation is not analogous to the pedestrian “wave on” cases, however, as plaintiff and Hoberman had the opportunity to actually speak with Bowles, rather than rely on the meaning of hand signals. Here, Hoberman only asked for permission, and permission was granted. Plaintiff was silent. Moreover, it is clear that the street was passable, as Hoberman, riding in front of plaintiff, rode safely through without incident.
Plaintiff further argues that she justifiably relied on Bowles’ granting permission, and that because he granted them permission to cross, a special relationship existed between the parties, as articulated in Cuffy v City of New York (69 NY2d 255, 260 [1987]), such that the City must be held liable for her injuries based on his duty to warn. However, this argument fails on several grounds. The complaint does not articulate a claim of special duty (see Davis v Owens, 259 AD2d 272, 273 [1st Dept 1999], lv denied 93 NY2d 810 [1999]). The claim was explicitly disavowed in plaintiffs papers submitted in opposition to the City’s motion for summary judgment, which stated, “No special duty is created, contemplated or claimed. This is pure negligence.” (Document 23-5, Mar. 24, 2009, plaintiff aff in opposition II18.) Even were the court to entertain the claim at this late juncture, after the jury’s verdict, it cannot be found that plaintiff sufficiently established that the City assumed an affirmative duty to act on her behalf, the first prong that must be established under Cuffy (69 NY2d at 260). Bowles made no promises whatsoever, and his action in granting them permission to bike through the transverse does not by itself establish a voluntary undertaking of a duty to act on her behalf such that plaintiff could be justified in relaxing her vigilance or foregoing other avenues of protection (Cuffy at 260). Moreover, under McLean v City of New York (12 NY3d 194 [2009], supra), as previously stated, a discretionary governmental action is never a basis for liability, and ministerial action may be only if it violates a special duty owed to the plaintiff, apart from any duty to the public in general (McLean at 202-203).
Because Bowles’ action was a discretionary governmental action, defendant’s motion to set aside the verdict must be granted (CPLR 4404 [a]). There is in fact no valid line of reasoning and permissible inferences which could lead to the conclusion reached by the jury on the basis of the evidence presented at trial (Shubbuck v Conners, 15 NY3d 871, 872 [2010]). The City’s *382 arguments are persuasive that its employee was undertaking a discretionary task and that any negligence by Bowles in failing to warn of the potholes’ existence cannot be imputed to the City. The City is immune from suit under the facts. Therefore, the jury should not have been posed the questions about whether Bowles’ actions were negligent or were a substantial cause of plaintiffs injury.
The branch of the City’s motion in the alternative, and the entirety of plaintiffs cross motion, are denied as academic.
For the foregoing reasons, the verdict must be set aside as against the weight of the evidence and judgment entered in favor of the defendants, dismissing the complaint. It is ordered that the City’s motion pursuant to CPLR 4404 (a) to set aside the jury verdict on the ground that plaintiff failed to establish a prima facie case, and enter judgment in favor of the City as a matter of law, is granted, and the branch of its motion in the alternative is denied as academic; and it is further ordered that plaintiffs cross motion is denied in its entirety.

. The City also seeks a stay of the entry of judgment until 60 days after the decision on all post-trial motions, including motions pertaining to the judgment itself.

. References to document numbers refer to the number under which they are e-filed in the New York Supreme Court e-filing system.

. Bowles also testified that when asked by the bicyclist “[c]an we still get through,” he and the other DOT worker both said, “Yes, go ahead” (document 41, Bowles EBT at 699).

. Miller concerned a student who sued the State after she was raped in her State University of New York dormitory, alleging failure to provide adequate police protection and to keep the dormitory outer doors locked. The State was held immune from suit as to its governmental function of providing adequate police protection, but was found liable in its capacity as landlord of the dormitory, given that the proximate cause of the plaintiffs rape was the failure to lock the outer doors (62 NY2d at 512-513).